IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| HARRY J. BROWN, | ) | 8:12CV411 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, plaintiff Harry J. Brown ("Brown") argues that the Commissioner of Social Security committed reversible error in determining that he is not entitled to disability insurance benefits. For the reasons discussed below, the Commissioner's decision is affirmed.

## I. BACKGROUND

On May 26, 2009, Brown filed an application for disability insurance benefits. (Tr. 13, 106-07.) In his application, Brown alleged that he has been disabled since January 16, 2007. (Tr. 13.) Brown's application was denied initially and on reconsideration. (*Id*.) On August 4, 2011, an administrative law judge ("ALJ") issued a decision finding that Brown was not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. (Tr. 14-29.) In her decision, the ALJ followed the five-step sequential analysis prescribed by the Social Security

Regulations to evaluate Brown's disability claim.[1]  See 20 C.F.R. §§ 404.1520, 416.920.  The ALJ found as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since January 16, 2007, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.871 *et seq.*).

3. The claimant has the following severe impairments: mild to moderate degenerative joint disease of the cervical spine; chronic neck, shoulder, low back and knee pain; bilateral carpal tunnel syndrome; cognitive disorder status-post left frontal contusion, mild to moderate after traumatic brain injury, and obesity (20 CFR 202.1520(c) and 416.920(c)).

---

[1]The Social Security Administration uses a five-step process to determine whether a claimant is disabled.  These steps are described as follows:

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that he can only occasionally climb and crawl and must avoid concentrated exposure to vibrations and hazards. Furthermore, he is limited to work that requires him only to understand, remember and carry out simple instructions, and perform routine tasks.

6. The claimant is capable of performing past relevant work as a cashier and tree trimmer. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability as defined in the Social Security Act, from January 16, 2007, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 15-28.) After the ALJ issued her decision, Brown filed a request for a review with the Appeals Council of the Social Security Administration. (Tr. 7-8.) On October 11, 2012, the Appeals Council denied Brown's request for review. (Tr. 1-3.) Thus, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

## II. STANDARD OF REVIEW

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a

preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.* at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. *Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995).

### III.  DISCUSSION

**A.  Relevant Medical History and Opinions**

On March 5, 2005, Brown was involved in a motorcycle crash. (Tr. 305-06.) During the crash, Brown was T-boned by two vehicles and thrown from his motorcycle. (*Id.*) Brown sustained a closed brain injury, a scapular fracture, a pulmonary contusion, and a knee avulsion. (*Id.*) He was hospitalized until March 24, 2005, at which time he was transferred to a rehabilitation facility. (Tr. 18, 305-06, 470.) On April 13, 2005, Brown was discharged and began outpatient physical therapy, occupational therapy, and speech therapy. (Tr. 18, 444, 470-71.)

On May 10, 2005, Dr. Renee Hudson ("Hudson") performed a neuropsychological evaluation on Brown. (Tr. 470-74.) During her evaluation, Brown denied alcohol or marijuana use and reported, among other things, that he graduated from high school, had no history of learning disability, and "no difficulty with his memory." (Tr. 470-71.) After conducting numerous tests, Dr. Hudson concluded Brown had a "level of intellectual functioning . . . at the lower end of the

4

Average range to Average." (Tr. 471-72.) She determined that Brown was borderline impaired in his auditory divided attention and ability to use external feedback to be flexible in a problem-solving approach. (Tr. 472.) He was also borderline impaired in his fine motor speed and coordination in his nondominant right hand. (*Id*.) She concluded that Brown's cognitive functioning was moderately to severely impaired in several areas, including his single-word reading skills, auditory memory on a list-learning task, recall on an initial learning trial, and copying skills when asked to copy a complex figure. (Tr. 473.)

Overall, Hudson found Brown to demonstrate some deficit in executive functioning, particularly with impulse control, and mild residual memory difficulty. (*Id*.) She diagnosed him with "Cognitive Disorder, Not Otherwise Specified, secondary to acquired brain injury." (*Id*.) She believed that Brown possessed the basic cognitive abilities to make reasonable and informed decisions regarding personal, financial, and medical issues, and recommended that he could return to work as a cashier in a gas station. (*Id*.) Because of his impulsivity, Hudson recommended that Brown "refrain from driving for at least a few more weeks." (*Id*.) She further recommended that his neuropsychology be reassessed in six months and strongly discouraged him from working as a mechanic. (*Id*.)

On November 16, 2007, Dr. Jan Golnick ("Golnick"), a neurologist, examined Brown. (Tr. 475-83.) During her examination, Golnick performed a Barrow Neurological Institute ("BNI") Screen for Higher Cerebral Function. (Tr. 479.) The BNI results showed that Brown's attention and concentration were low, but his affect orientation and memory scores were normal. (*Id*.) Brown's overall BNI score placed him in the "3.2 percentile for his age group." (*Id*.) Golnick also indicated that there was a positive Romberg test because Brown swayed with his eyes closed.[2] (Tr. 480.)

---

[2] In a Romberg test, the subject, with feet approximated, "stands with eyes open and then closed; if closing the eyes increases the unsteadiness, a loss of proprioceptive control is indicated, and the sign is positive." STEADMAN'S MEDICAL DICTIONARY

5

Golnick concluded Brown had sustained a significant posttraumatic brain injury and had a deficit to the left hemisphere of his brain. (Tr. 481.) She believed he was unable to work as a car mechanic and she was afraid he would "be able to perform only a non-skilled labor type job with light duties only." (*Id*.) She recommended assistance from "Vocational Rehabilitation Services" to help him find suitable employment. (*Id*.)

On October 21, 2008, Dr. Joseph Rizzo ("Rizzo") conducted a psychological consultative examination of Brown. (Tr. 486-91.) During the examination, Brown reported that he nearly graduated high school, was in special education for various classes, frequently forgets where he is going, could not keep things in his mind long enough to successfully work through them, and drinks one half-pint of cognac every few days. (Tr. 486-87, 490-91.) Rizzo noted that Brown's reports regarding his education and alcohol use contradicted his earlier statements to Dr. Hudson. (Tr. 486-87.) During the examination, Brown completed a "Wechsler Adult Intelligence Scale - III Edition" test, which revealed that he was functioning within the "low average range" of intelligence. (Tr. 487.) Rizzo concluded that Brown's "cognitive and memory function" was adequate and that he seemed to be competent to handle his own funds. (Tr. 491.) Overall, Rizzo stated Brown did "not seem to be able to function adequately," but later wrote that Brown's "situation seems to have improved since the date of his injury, but is still quite substantial and is functional." (*Id*.)

On November 3, 2008, state agency psychologist Dr. Lee Branham ("Branham") performed a Mental Residual Functional Capacity Assessment of Brown. (Tr. 499-518.) In his assessment, Branham concluded that Brown was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain concentration for extended periods, and respond appropriately to changes in the work setting. (Tr. 500-01.) Branham also noted that

---

1640 (27th ed. 2000).

Brown was mildly limited in social functioning, moderately limited in daily living activities, and moderately limited in maintaining concentration, persistence and pace. (Tr. 515.) However, Branham specifically concluded that Brown was capable of handling simple instructions and was otherwise not significantly limited. (Tr. 500-01, 503.) To reach his conclusions, Branham reviewed the opinions of Dr. Hudson, Dr. Golnick, and Dr. Rizzo. (Tr. 502.)

On August 31, 2009, Dr. Jennifer Lindner ("Lindner") conducted a psychological examination of Brown. (Tr. 520-23.) During her examination, Brown reported that he smoked marijuana 1-2 times a week and had an occasional beer. (Tr. 521.) Lindner found Brown to be "oriented to day, place, time, and person, but not to date." (Tr. 521.) She determined Brown was capable of understanding short and simple instructions, carrying out simple instructions, carrying out instructions under ordinary supervision, and interacting appropriately with co-workers and supervisors. (Tr. 522.) However, Lindner concluded Brown had "significant problems with memory and attention" and was not capable of working without assistance. (*Id*.)

On October 19, 2009, Dr. Darin E. Jackson ("Jackson") performed a consultative evaluation of Brown. (Tr. 545-48.) During the evaluation, Brown reported he was experiencing chronic pain in his back, right knee, and right shoulder. (Tr. 547.) Jackson concluded Brown's pain "may limit his future employment options to those that do not require much heavy lifting or physical activity." (Tr. 547-48.) Jackson also stated that Brown's past traumatic brain injury had affected his memory and ability to stay on task, which could also limit his employment options. (Tr. 548.) Jackson indicated that Brown had "good motor strength throughout and his fine motor skills are intact." (*Id*.) [3]

---

[3]The record also contains opinions for state agency physicians regarding Brown's physical residual functional capacity. (Tr. 21, 552-565.) The ALJ gave these opinions "great weight" and Brown does not appear to take issue with this part of the ALJ's residual functional capacity assessment. (Tr. 21; Filings 11 and 19.)

7

Between December 2010 and May 2011, Brown attended physical therapy. (Tr. 577-93.) By January 2011, the physical therapist reported that Brown had met nearly all of his short- and long-term physical therapy goals. (Tr. 588.) In April 2011, Brown visited the pain clinic to manage cervical neck pain, which he described as greater than 8 on the Visual Analog Scale of 1-10. (Tr. 571.) During his visit to the pain clinic, Brown was assessed with carpal tunnel syndrome bilateral. (Tr. 587.)

With regard to non-medical opinions, Brown's wife, Jessica Brown, submitted two disability reports on Brown's behalf. (Tr. 281-92.) In the reports, Jessica stated that Brown could not take care of himself and that she had to "take care of everything." (*Id*.) She also reported that Brown lacked personal hygiene, could not fill out paperwork due to limitations in his reading and writing skills, and could not shop for himself. (*Id*.)

B.   **Hearing Testimony**

On August 4, 2011, the ALJ held a hearing and Brown testified. (Tr. 45-103.) During his testimony, Brown stated that he smoked two small cigars a day, and "drank a beer once every two months at the most." (Tr. 58.) Brown described his daily activities, which included taking care of his dogs, playing video games, and taking his children to the pool. (Tr. 62-64, 66-67.) Brown stated he occasionally went to the grocery store, but needed someone to accompany him to help him read the list. (Tr. 64-65.) Brown said he drives to his daughter's baseball games in the summer, parks as close as he can, and cheers from the vehicle. (Tr. 69.) He also stated that he occasionally rides his motorcycle. (Tr. 67.)

Jessica also testified at the hearing. (Tr. 81-89.) During her testimony, Jessica said that she treated her husband "just like a child." (Tr. 84.) She said she helped him bathe and, because of his poor balance, performed all of his shaving. (*Id*.) With regard to household tasks, Jessica stated Brown could "help carry up laundry, [and]

8

carry in groceries." (Tr. 83.) She could send him on errands to Walgreen's or the gas station, but only if he was accompanied by one of his daughters. (Tr. 86-88.)

After Jessica testified, the ALJ asked a vocational expert to consider a hypothetical claimant of Brown's age, educational level, and work experience. (Tr. 89, 91.) This individual was "in the medium exceptional level and may occasionally climb and crawl and must avoid concentrated exposure to vibrations and hazards." (Tr. 91.) The ALJ asked if such an individual could perform Brown's past relevant work or other jobs. (*Id*.) The vocational expert testified the hypothetical individual could perform Brown's past work (i.e. as a mechanic, cashier, or tree trimmer), as well as medium unskilled labor as a janitor, laundry worker, and kitchen helper. (Tr. 89-92.)

Next, the ALJ asked the vocational expert to consider an individual with the same restrictions as her first hypothetical claimant, but to add that the individual is moderately impaired in his ability to understand, remember, and carry out detailed instructions. (Tr. 92-93.) The ALJ asked if this additional consideration would affect the vocational expert's answer. (Tr. 93-95.) The vocational expert testified that the individual in the second hypothetical would not be able to work as an auto mechanic, but would still be able to work as a cashier or a tree trimmer. (*Id*.)

## C. Brown's Arguments on Appeal

In his appeal brief, Brown argues that the ALJ's opinion is not supported by substantial evidence because (1) the ALJ's residual functional capacity assessment and hypothetical question do not precisely set forth his credible limitations, (2) the ALJ failed to adequately evaluate the work-related limitations imposed by examining psychologists Dr. Rizzo and Dr. Lindner, (3) the ALJ erred in relying on the opinions of the non-examining state agency psychological consultant, and (4) the ALJ failed to fully and fairly develop the record. (Filing 11 at CM/ECF pp. 15-27; Filing 19 at CM/ECF pp. 2-7.) The Commissioner contends that the ALJ's decision is supported

9

by substantial evidence. (Filing 17 at CM/ECF pp. 9-17.) I agree with the Commissioner.

   1.   *Residual Functional Capacity Omits Credible Limitations*

First, Brown argues that despite giving Dr. Hudson's opinion "great weight," the ALJ's assessment of Brown's mental residual functional capacity and hypothetical question do not resemble Dr. Hudson's opinion. (Filing 11 at CM/ECF p. 15.) More specifically, Brown argues that the ALJ did not include limitations that accurately reflected Dr. Hudson's conclusions regarding his mental functioning and ability to use his wrists and hands. (*Id*. at CM/ECF pp. 15-18.)

"ALJs bear the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010). As discussed above, Hudson determined that Brown was borderline impaired in his auditory divided attention and ability to use external feedback to be flexible in a problem-solving approach. (Tr. 472.) She also found Brown to be borderline impaired in his fine motor speed and coordination in his nondominant right hand. (*Id*.) She concluded that Brown's cognitive functioning was moderately to severely impaired in his single-word reading skills, auditory memory on a list-learning task, recall on an initial learning trial, and copying skills when asked to copy a complex figure. (Tr. 473.) Because of his impulsivity, Hudson recommended that Brown "refrain from driving for at least a few more weeks." (*Id*.) Overall, Hudson found Brown to demonstrate some deficit in executive functioning, particularly with impulse control, and mild residual memory difficulty. (*Id*.)

In her residual functional capacity determination, the ALJ concluded Brown had the ability to perform medium work, could only occasionally climb and crawl, must avoid concentrated exposure to vibrations and hazards, and could only perform work that required him to understand, remember, and carry out simple instructions,

and perform routine tasks. (Tr. 18.) In his Brief, Brown admits that the ALJ "arguable addressed" his divided attention and problem-solving limitations by finding that he was limited to "routine tasks." (Filing 11 at CM/ECF p. 17.) However, he insists that the ALJ did not include a limitation to address his fine motor speed and coordination limitations in the right hand. (*Id*.) He further asserts that this limitation is supported by his "bilateral carpal tunnel syndrome" diagnosis. (*Id*.)

Brown appears to have overlooked the details within the ALJ's opinion. In explaining her residual functional capacity determination, the ALJ stated Brown "should avoid concentrated exposure to vibrations *due to his carpal tunnel syndrome*." (Tr. 21 (emphasis added).) The ALJ also specifically includes this limitation in her residual functional capacity determination, stating that Brown must avoid "concentrated exposure to vibrations and hazards." (Tr. 18.) Simply put, Brown's argument that the ALJ failed to include "any limitations" on his ability to use his wrists and hands lacks merit.

Toward the end of his first argument, Brown adds a conclusory sentence stating that the ALJ "failed to impose any limitations on [his] exposure to hazards, impulsive behavior, need to drive, and the like." (Filing 11 at CM/ECF p. 18.) Again, the ALJ's residual functional capacity determination specifically includes a limitation that Brown avoid "concentrated exposure to . . . *hazards*." (Tr. 18 (emphasis added).) Moreover, the record as a whole supports the ALJ's residual functional capacity determination with regard to Brown's ability to drive. Dr. Hudson recommended in March 2005 that Brown "refrain from driving for *at least a few more weeks*," and hearing testimony from August 2011 shows that Brown currently drives to his daughters' games and occasionally rides his motorcycle. (Tr. 473 (emphasis added); Tr. 67, 69.)

*2. Discounting Examining Psychologists' Opinions*

Second, Brown argues the ALJ failed to adequately evaluate the work-related limitations imposed by Dr. Rizzo and Dr. Lindner. (Filing 11 at CM/ECF pp. 18-22.) More specifically, Brown argues that the ALJ failed to provide good reasons for not giving Dr. Rizzo's and Dr. Lindner's opinions "significant weight." (*Id.*)

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). While "a treating physician's opinion is generally entitled to substantial weight, that opinion does not 'automatically control' in the face of other credible evidence on the record that detracts from that opinion." *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009); *see also Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). Indeed, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation marks omitted). However, "[w]hen an ALJ discounts a treating physician's opinion he should give 'good reasons' for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)

In determining Brown's residual functional capacity, the ALJ reviewed, among other things, opinions from four examining mental-health professionals: Dr. Hudson, Dr. Golnik, Dr. Rizzo, and Dr. Lindner. (Tr. 22-26.) After reviewing these opinions, the ALJ gave "great weight" to Dr. Hudson's opinion, "some weight" to Dr. Golnik's opinion, and "little weight" to Dr. Rizzo and Dr. Lindner's opinions. (Tr. 21, 25-26.)

With regard to Dr. Rizzo's opinion, the ALJ gave it "little weight" for the following reasons:

> First, Dr. Rizzo's report contains inconsistencies and his opinion is accordingly rendered less persuasive. His own test results showed that the claimant was generally functioning in the average range. Further, Dr. Rizzo stated at the conclusion of his report that the claimant was improved since his injury and is "functional", which is in direct conflict with his statement that the claimant "does not seem to be able to function adequately." Second, Dr. Rizzo's report appears to be based on inconsistent reports by the claimant. For example, the claimant told Dr. Rizzo that he nearly graduated high school and that he was in special education while in school, which is inconsistent with his previous reports to Dr. Hudson. The claimant also told Dr. Rizzo that he was drinking one half pint of cognac every several days, when he had previously denied any use of alcohol. He also reported significant problems with his memory, yet did not acknowledge the need for any memory devices. Certainly, an opinion based on unreliable reports is itself unreliable. Dr. Rizzo's opinion is also vague in that it does not provide specific functional restrictions.

(Tr. 25-26 (internal citations omitted).) Brown acknowledges that Dr. Rizzo based his opinion on unreliable reports, and that an opinion based on unreliable reports is "arguably . . . unreliable." (Filing 11 at CM/ECF p. 20.) However, Brown argues that Dr. Rizzo did not blindly accept his reports and that Dr. Rizzo is the expert in this case, not the ALJ. (*Id*.) Brown suggests that the Eighth Circuit's opinion in *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997), supports his position. (*Id*.; Filing 19 at CM/ECF p. 5.)

In *Flanery*, the Eighth Circuit concluded that an ALJ erred in discounting medical diagnoses because they were based only on the claimant's recitation of events regarding her seizures. 112 F.3d at 350. These seizures were also objectively witnessed by multiple individuals and the claimant's testimony was supported by EEG

13

readings. *Id*. Here, Brown's alleged disability is related psychological symptoms, not seizures, and his reports are clearly inconsistent. Indeed, Brown reported that he graduated high school to Dr. Hudson, but stated he "nearly graduated high school" to Dr. Rizzo. (Tr. 470, 486.) Brown reported having "no difficulty with his memory" to Dr. Hudson, but that "he frequently forgets where he is going" and "cannot keep things in his mind long enough to successfully work through them" to Dr. Rizzo. (Tr. 471, 490-91.) Brown denied using alcohol to Dr. Hudson, but reported drinking a half pint of cognac every several days to Dr. Rizzo. (Tr. 470, 487.) The ALJ identified these inconsistent reports, as well as Dr. Rizzo's own tests, which showed that Brown's memory function was in the average range.[4] (Tr. 25-26, 490.) Unlike *Flanery*, the record in this matter contains sufficient evidence for both the medical professionals and the ALJ to doubt Brown's reports. *See Flanery,* 112 F.3d at 350 (finding "[t]here is nothing in this record to suggest that [claimant's] medical professionals should have doubted [claimant's] word. Her claimed symptoms are consistent with objective tests (the EEG), the nature of her disorder, and eyewitness testimony"). The ALJ did not err in concluding that Brown's reports to Rizzo were unreliable or in discounting Rizzo's opinion on that basis.

Brown also argues that the ALJ failed to fully develop the record regarding Dr. Rizzo's contradictory statements. (Filing 11 at CM/ECF pp. 20-21.) As discussed above, Dr. Rizzo stated that Brown's "situation seems to have improved since the date of his injury, but is still quite substantial and is functional." (Tr. 491.) However, Dr. Rizzo also stated Brown "does not seem to be able to function adequately." (*Id*.) Brown believes that these contradictory statements created ambiguity requiring the ALJ to recontact Dr. Rizzo for clarification. (Filing 11 at CM/ECF p. 21.) Although this argument seems misplaced (*see infra* Part.III.C.4), I will briefly address it here.

---

[4]BNI results from Dr. Golnick's examination also showed that Brown's memory scores were normal. (Tr. 479.)

"[S]ocial security hearings are non-adversarial," and an ALJ has a duty to fully develop the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). However, an ALJ is not required to "recontact a treating physician whose opinion was inherently contradictory or unreliable." *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006). "This is especially true when the ALJ is able to determine from the record whether the applicant is disabled." *Id.*; *see also Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) (holding that there is no need to recontact a treating physician where the ALJ can determine from the record whether the applicant is disabled). In this case, the ALJ gave several reasons, not just contradictory statements, for discounting Dr. Rizzo's opinion. In addition, the record as a whole contains ample evidence upon which the ALJ could make an informed determination on the merits of Brown's disability claim. Under these circumstances, the ALJ was under no obligation to recontact Dr. Rizzo to clarify his contradictory statements.

Turning to why the ALJ discounted Dr. Lindner's opinion, the ALJ explained:

> Like Dr. Rizzo, Dr. Lindner based her opinion on unreliable reports from the claimant and her report is internally inconsistent. Further, it is not supported by her own objective findings that the claimant was oriented to day, place, time, and person or that he displayed concrete reasoning skills, upbeat mood, and appropriate affect and emotional reactions.

(Tr. 26.) Beyond this explanation, the ALJ does not specifically identify which of Brown's reports to Dr. Lindner were unreliable, nor does she specify the internal inconsistences of Dr. Lindner's opinion.[5] (*Id.*) However, the ALJ does provide an explanation of how Dr. Lindner's opinion is not supported by her own objective

---

[5]I note, however, when the ALJ evaluated Brown's credibility she did identify inconsistent statements that Brown made to Dr. Lindner, Dr. Rizzo, and Dr. Hudson regarding his education level, drug use, and alcohol use. (Tr. 23-24, 470, 486, 490, 520-21.) Again, Brown does not dispute that his reports to the physicians were unreliable.

15

findings. (*Id.*) Her explanation is somewhat conclusory, but I find that a reasonable mind could find it adequate to support the ALJ's decision to discount Dr. Lindner's opinion. Indeed, Dr. Lindner's conclusion that Brown was not capable of working without assistance arguably conflicts with her findings that he was oriented to day, place, time, and person, displayed concrete reasoning skills, displayed upbeat mood, was capable of understanding short and simple instructions, was capable of carrying out simple instructions, was capable of carrying out instructions under ordinary supervision, and was capable of interacting appropriately with co-workers and supervisors. (Tr. 521-22.) *See, e.g., Dickerson v. Apfel*, No. 99–3777, 2000 WL 1836769 (8th Cir. 2000) (finding "the ALJ did not err in discounting the assessments of [claimant's] treating physician: the ALJ found the assessments internally inconsistent, and not fully supported by the physician's own clinical notes and other objective findings"); *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (concluding treating physician's opinion was not afforded deference where it was not supported by his own findings or diagnostic data); *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir. 1996) (holding, where treating physician's opinions are themselves inconsistent, they should be accorded less deference).

In short, the ALJ did not err in discounting Dr. Rizzo's and Dr. Lindner's opinions. The ALJ properly explained the weight she gave to various medical opinions and gave sufficient reasons for doing so. There is substantial evidence on the record as a whole that supports the ALJ's finding and it is consistent with the regulations and case law.

### 3. *Reliance Upon a Non-Examining State Agency Psychological Consultant's Opinion*

Third, Brown argues that the ALJ erred in relying on Dr. Branham's opinion. (Filing 11 at CM/ECF pp. 24-25.) Brown asserts there are "numerous" problems with this opinion, including that he did not evaluate Dr. Lindner's opinion, only noted that

16

Dr. Hudson's testing "showed some areas of significant cognitive deficit," and overlooked or ignored test results from Dr. Golnick. (*Id*. at CM/ECF p. 24-25; Filing 19 at CM/ECF p. 6.) Although Brown may disagree with the ALJ's reliance on Dr. Branham's opinion, she did not err in doing so because it is consistent with the medical evidence as a whole. *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) ("The ALJ did not err in considering the opinion of [the state agency medical consultant] along with the medical evidence as a whole.").

### 4. *Failure to Fully and Fairly Develop the Record*

Last, Brown argues that the ALJ failed to fully develop the record regarding the significance of the neuropsychological testing performed by the examining psychologists. (Filing 11 at CM/ECF pp. 25-27.) In support of this argument, Brown lists a number of tests that were performed by Dr. Hudson and Dr. Golnick and asserts that the ALJ is not "professionally qualified" to interpret the results of these tests. (*Id*. at CM/ECF p. 27.) However, Brown does not argue, nor does the record show, that the ALJ drew her own inferences from the test results. *Cf Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) ("'An administrative law judge may not draw upon his own inferences from medical reports.'") (*quoting Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975)). Rather, the ALJ properly considered the opinions of Dr. Hudson and Dr. Golnick, each of whom reported their own conclusions regarding the tests they performed. (Tr. 21, 24, 470-82.) *See Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) (concluding ALJ may make common sense judgments about functional capacity based on medical findings as long as he does not overstep the bounds of a lay person's competence and render a medical judgment). Brown does not explain why Dr. Hudson's or Dr. Golnick's opinions needed further development. (Filing 11 at CM/ECF p. 25.)

Brown also suggests that the ALJ failed to fully develop the record by not ordering a "vocational evaluation," a recommendation that Dr. Lindner made to

17

determine whether Brown could work with support. (Filing 11 at CM/ECF p. 27.) This argument fails for several reasons. First, Brown cites no authority showing that an ALJ *must* order a vocational evaluation because an examining physician recommended one. Second, the ALJ gave Dr. Lindner's opinion and recommendation "little weight." (Tr. 26; *see also supra* Part III.C.2.) Third, the ALJ reviewed the entire record in this matter and, as a whole, it was sufficient for the ALJ to determine Brown's residual functional capacity.

In short, Brown's disagreement with the ALJ's determination does not mean she failed to fully develop the record.

### IV. CONCLUSION

For the reasons explained above, I find the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g). Final judgment will be entered by separate document.

DATED this 30th day of December, 2013.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.